IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEAN L. DEYOUNG,                                                    CV 04-6177-CO

               Plaintiff,                                    FINDINGS AND
                                                                    RECOMMENDATION

    v.

JO ANNE B. BARNHART, Commissioner of Social
Security.

               Defendant.


       KATHRYN TASSINARI
       DREW L. JOHNSON
       1700 Valley River Drive, First Floor
       Eugene, OR  97401

            Attorney for Plaintiff

       KARIN J. IMMERGUT
       United States Attorney
       CRAIG J. CASEY
       Assistance United States Attorney
       1000 S.W. Third Avenue, Suite 600
       Portland, OR  97204-2902

       JEFFREY BAIRD
       Special Assistant United States Attorney
       Social Security Administration
       701 5th Avenue, Suite 2900 M/S 901
       Seattle, WA  98104-7075

Attorneys for Defendant

COONEY, Magistrate Judge:

## INTRODUCTION

Plaintiff, Dean L. DeYoung (DeYoung), brings this action for judicial review of a final decision of the Commissioner of Social Security denying his application for Supplemental Security Income benefits (SSI) under Title XVI of the Social Security Act (the Act). 42 U.S.C. §§ 1381-1383f. This Court has jurisdiction under 42 U.S.C. § 405(g).

## BACKGROUND

DeYoung was 52 years old at the time of his hearing before the ALJ. Tr. 50. He has a high school education, and past work as a shop helper, landscaper, and handyman. Tr. 53, 88. DeYoung alleges disability beginning August 1, 2000, due to carpel tunnel syndrome, severe depression, and social problems. Tr. 16.

On appeal to this court, DeYoung contends the ALJ: (1) improperly rejected the examining opinion of William Trueblood, Ph.D.; (2) improperly rejected DeYoung's own testimony; (3) improperly rejected the lay witness testimony; and (4) failed to meet his burden of showing DeYoung is capable of performing "other work" at step five of the sequential evaluation.

For the following reasons, the Commissioner's decision should be AFFIRMED and this case should be DISMISSED.

## STANDARD OF REVIEW

The initial burden of proof rests on the claimant to establish disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner bears the burden of developing the record. <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Id</u>.

The court must weigh all the evidence, whether it supports or detracts from the Commissioner's decision. <u>Martinez v. Heckler</u>, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, even if the evidence is susceptible to more than one rational interpretation. <u>Andrews</u>, 53 F.3d at 1039-40. If the evidence supports the Commissioner's conclusion, the Commissioner must be affirmed; "the court may not substitute its judgment for that of the Commissioner." <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1156 (9th Cir. 2001).

## <u>DISABILITY ANALYSIS</u>

The Commissioner has established a five-step sequential process for determining whether a person is disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520. Each step is potentially dispositive. The claimant bears the burden of proof at steps one through four. <u>See Tacket v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999). The burden shifts to the Commissioner, at step five, to identify jobs existing in significant numbers in the national economy that the claimant can perform. <u>Id</u>.; <u>see also</u> 20 C.F.R. § 416.960(c)(2).

Here, at step one, the ALJ found that DeYoung had not engaged in substantial gainful activity since his alleged onset of disability. Tr. 16, 22; see 20 C.F.R. § 416.920(b).

At step two, the ALJ found that DeYoung had the following combination of severe impairments: depression, personality disorder, anxiety disorder, carpal tunnel syndrome, and mild pulmonary disease. Tr. 17, 23; see 20 C.F.R. § 416.920(c).

At step three, the ALJ found that DeYoung's impairments did not meet or equal the criteria of a listed impairment (Listings). Tr. 17, 23; see Bowen v. Yuckert, 482 U.S. 137, 140-141 (1987); 20 C.F.R. § 416.920(d).

The ALJ assessed DeYoung with the residual functional capacity for medium work with no repetitive fine motor dexterity, simple one and two step tasks, no intense interpersonal relationships, and limited to dealing with things, not people. Tr. 17, 23; see 20 C.F.R. § 416.920(e), 416.945; Social Security Ruling 96-8p.

At step four, the ALJ found that DeYoung had no past relevant work that rose to the level of substantial gainful activity. Tr. 21, 23; see 20 C.F.R. § 416.920(f).

At step five, however, the ALJ determined that DeYoung could perform other work existing in significant numbers in the national economy, such as the jobs of hand packager, industrial cleaner, motel cleaner, seedling sorter, and laundry folder. Tr. 23; see 20 C.F.R. § 416.966.

**DISCUSSION**

I.      **The ALJ provided legally sufficient reasons to reject DeYoung's subjective reports.**

DeYoung contends the ALJ failed to point to clear and convincing reasons to reject his testimony. He references the ALJ's citation of DeYoung's behavior at the hearing as "overly theatrical." Tr. 18. DeYoung argues that the ALJ's observations at the hearing do not constitute "substantial evidence" because the ALJ is not a psychologist or a psychiatrist trained in making clinical observations of mental illness.

In assessing a claimant's credibility the ALJ may consider: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the objective medical evidence; (5) the location, duration, frequency, and intensity of symptoms; (6) precipitating and aggravating factors; (7) the type, dosage, effectiveness, and side effects of any medication; and (8) treatment other than medication. See Smolen v. Chater, 80 .3d 1273, 1284 (9th Cir. 1996). Further, the ALJ may use first-hand observations as one factor among several in the general credibility evaluation. See Morgan v. Commissioner of SSA, 169 F.3d 595, 599-600 (9th Cir. 1999).

DeYoung is correct that the ALJ considered DeYoung's dramatic presentation at the hearing, which he characterized as "rocking and holding his head [in] his hands during part of it," as one factor among several reasons to discredit him. However, the ALJ cited numerous other reasons to find DeYoung less than fully credible as well. The ALJ found that DeYoung's activities of daily living were inconsistent with the degree of mental limitation he alleged. For instance, the ALJ noted that DeYoung took a trip "where he traveled by plane and drove back with a friend. He reported having a good time on a day long trip to a country fair." Tr. 20. The ALJ also found that DeYoung's

minimal work history and social activities were consistent with "an alternative, minimal lifestyle" in which DeYoung "applies his energies and intellect to things he wants to, such as tarot card reading, astrology and medicine pipe reading which he describes himself as excellent at." Id. Further, the ALJ noted, "[DeYoung] has worked when he wanted to, for example working in exchange for rent and working for marijuana." Id. In sum, the ALJ concluded that while DeYoung's activities of daily living, and his hygiene, may be limited, "much of the limitation appears to be by choice and not due to mental health impairments." Id.

The ALJ also found that medical compliance was an issue for DeYoung. See 20 C.F.R. 416.930. DeYoung claims to have severe pulmonary disease, but has failed to comply with his doctor's admonitions to quit smoking. Tr. 20. Instead, DeYoung minimized the effects of smoking on his condition, testifying that smoking tobacco and marijuana cigarettes "doesn't seem like it affects [his lung condition]." Tr. 283. DeYoung discontinued taking prescribed medication for his mental conditions, and then self-initiated a prescription for estrogen. Tr. 21. DeYoung has a condition called "trans-vestic fetishism with gender dysphoria," and began hormone therapy in March, 2003, with an expressed hope of becoming a female in the future. Tr. 248.

Notably, DeYoung experienced immediate improvement in his mood after beginning estrogen therapy. On April 4, 2003, DeYoung was "doing very well and feeling remarkably better after starting estrogen therapy," and on May 2, 2003, he continued to feel "much better." Tr. 247-48. Thus, even if DeYoung's non-compliance with the prescription for anti-depressants did not cause adverse effects, his documented improvement contradicts DeYoung's contention at the hearing on July 17, 2003, that he continues to be severely depressed. The ALJ cited this incongruence as another reason to discredit DeYoung. Tr. 18.

The ALJ also noted that DeYoung exaggerated the severity of his pulmonary disease, which the ALJ determined was not a severe condition. Tr. 21, 247. David Knowlton, M.D., reviewed DeYoung's treatment records for this condition and reported that DeYoung's "pulmonary function tests are much better than what I was led to believe. His cardiac ECHO was normal, and his laboratory evaluations were all unremarkable...." Tr. 247. Thus, the ALJ properly inferred that DeYoung had a tendency to exaggerate his symptoms in order to further his disability claim.

The ALJ also found DeYoung's practice of trading work for marijuana demonstrated both an ability to work when it suits him, and a willingness to violate the law. Tr. 20-21, 239, 281-85. DeYoung's landlord, whom he refers to as his "step-daughter," testified that she usually gives DeYoung a "joint" of marijuana each day from her supply of medical marijuana. Significantly, although the ALJ found that DeYoung was not disabled--and I find this conclusion should be affirmed--if DeYoung was found to be disabled upon review by a higher court his daily use of marijuana would be considered vis-a-vis the drug and alcohol abuse analysis, which attempts to "separate out" the effect a claimant's ongoing substance abuse may have on his ability to work. 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J). Under these provisions, if a claimant would be capable of performing other work if he were not abusing drugs and alcohol, then he is ineligible for disability benefits. Id.

In sum, I find substantial evidence in the record in support of the ALJ's credibility assessment. I also find the ALJ's reasons for concluding that DeYoung is less than fully credible are both clear and convincing.

## II.    The ALJ provided legally sufficient reasons to reject Dr. Trueblood's opinion.

DeYoung argues that the ALJ failed to give clear and convincing reasons to discredit the opinion of William Trueblood, Ph.D., that DeYoung had a "marked" impairment in activities of daily living and in social functioning, and a "moderate" impairment in concentration, persistence, or pace. Tr. 243-44.

The ALJ must provide "clear and convincing reasons," supported by substantial evidence in the record, for rejecting the opinion of a claimant's physician when it is not contradicted by another doctor. See Morgan v. Commissioner of Social Security Administration, 169 F.3d 595, 600 (9th Cir. 1999). If a treating physician's opinion is contradicted by another doctor, the Commissioner may reject it by providing "specific and legitimate reasons" supported by substantial evidence in the record. Id. at 600-601.

In the instant case, Dr. Trueblood's opinion was contradicted by another doctor, therefore the ALJ was only required to provide specific and legitimate reasons for rejecting it. The ALJ rejected Dr. Trueblood's assessment in part because he found that Dr. Trueblood placed undue emphasis on DeYoung's discredited subjective reports, and also because medical treatment records indicated DeYoung was not as impaired as Dr. Trueblood's functional assessment indicated. Tr. 18-19.

The record contains two psychological evaluation reports from Dr. Trueblood. The first evaluation was performed in April 2001. Tr. 122-28. Dr. Trueblood found adequate hygiene; no pain behavior; normal gait; average activity level; relevant, logical, and goal directed statements; good attention; subdued affect, but with reduced anxiety as the examination progressed; good insight and judgment; and average intellect. Tr. 126. On this occasion Dr. Trueblood diagnosed DeYoung with (1) social phobia, generalized; (2) dysthemia; (3) transvestitic fetishism with gender dysphoria;

(4) psychological factors affecting physical condition; (5) cannabis abuse; and (6) avoidant personality disorder. Tr. 127.

The second evaluation, performed one year later in April 2002, produced similar results, although DeYoung's hygiene had declined, and he appeared depressed. Tr. 240. Yet, in the second evaluation DeYoung scored in the superior range in intellectual testing. Id. Dr. Trueblood also noted this time that he did not think DeYoung's cannabis abuse was contributing significantly to DeYoung's impairments.

The ALJ discredited Dr. Truebloods opinion that DeYoung was "markedly" limited in activities of daily functioning, and "moderately" limited in concentration, persistence or pace, because he found Dr. Trueblood relied heavily on DeYoung's self-reports, which the ALJ determined were not accurate. DeYoung points out that Dr. Trueblood also relied on his own observations of DeYoung, and that in April 2001, Dr. Trueblood also reviewed DeYoung's medical records. This assertion is only partially true. Dr. Trueblood's April 2001, report indicates that "the patient is the primary source of information regarding his current functioning and his personal history." Tr. 122. Dr. Trueblood also reviewed two discrete medical records: (1) an October 11, 2000, progress note written by Lisa Steffey, D.O., regarding DeYoung's carpel tunnel syndrome; and (2) an intake report from Deschutes County Mental Health dated October 17, 2000, diagnosing dysthymic disorder, generalized anxiety disorder, and transvestic fetishism with gender dysphoria--all were rule-out diagnosis. Tr. 122. However, the April 2002, report indicates that Dr. Trueblood relied exclusively on DeYoung's self report. Tr. 236.

I concur with DeYoung that perhaps the agency should have provided Dr. Trueblood with DeYoung's medical records since they requested the evaluation. However, this criticism does not

change the fact that Dr. Trueblood's assessment of marked levels of impairment was made after the second evaluation, indicating that Dr. Trueblood relied primarily on DeYoung's subjective reports to make it.

Unlike Dr. Trueblood, the ALJ did have the benefit of DeYoung's entire medical record. The ALJ found, "a longitudinal view of the claimant's condition as presented in his treatment records and the claimant's activities shows a much different picture [than Dr. Trueblood's reports reflect]." Tr. 18. The ALJ noted that progress notes from DeYoung's ongoing therapy with Tess Migdol, M.A., show almost immediate improvement in DeYoung's symptoms upon initiating treatment. Id. In November 2000, his anti-depressants were working. In March and April 2001, DeYoung showed improvement and brightened mood. In May 2001, DeYoung reported suicidal thoughts, but by July 2001, he reported attending the Oregon Country Fair and feeling more comfortable with himself and less depressed. In October 2001, DeYoung said his medications were working and he had improved sleep. In February, March, and May 2002, more improvement and less depression was noted.

In fact, as the ALJ pointed out,

> [t]here were only two times that the counselor's notes express a feeling that the claimant was disabled and could not work, both in the first ten months of the treatment relationship, and each apparently being in response to the claimant reporting both increased symptoms and that he had received [notice of denial of social security benefits].

Tr. 19. One is a May, 2001, report to Ms. Migdol that DeYoung was feeling suicidal, the same month DeYoung's first application for benefits was denied. Tr. 36,166. The other is a treatment note from November 2001, indicating that DeYoung was "really depressed last week [end of September] and found himself carving on his left wrist, self-mutilating." Tr. 231. The reconsideration decision, affirming denial of benefits was sent to DeYoung on August, 13, 2001. Tr. 42.

DeYoung points to these two records as evidence that he did not improve. I agree with the ALJ that it is more than coincidental that DeYoung reported an increase in symptoms after being denied social security benefits. However, even if there was no reason to question the reliability of these reports, they represent but two relapses in a three year period characterized by improvement.

The ALJ also thoroughly reviewed treatment notes from the Center for Family Development, where DeYoung was cared for by David Knowlton, M.D. Tr. 19. The ALJ noted that on the first visit with Dr. Knowlton, DeYoung admitted that his therapy with Ms. Migdol had been very beneficial. Id. Dr. Knowlton prescribed DeYoung an anti-depressant called Wellbutrin, which DeYoung responded well too. However, as noted above, DeYoung requested a change to estrogen therapy, which he told Dr. Knowlton he had used successfully in the past. Id. In April 2003, just three months before his hearing, DeYoung told Dr. Knowlton he was doing better than ever on the estrogen. Id.

The ALJ determined that Ms. Migdol and Dr. Knowlton's opinions were entitled to greater weight than Dr. Trueblood's opinion, because they had a treatment relationship with DeYoung cumulatively spanning several years, whereas Dr. Trueblood only examined DeYoung on two occasions, and did not have a treating relationship with him. Id. I agree with this determination, and I find the ALJ's reasons for rejecting the functional limitations endorsed by Dr. Trueblood were specific and legitimate.

III.    **The ALJ fairly assessed the lay witness testimony.**

DeYoung argues the ALJ wrongly rejected the testimony of Johanna Percilick and Abigail DeYoung. He contends their testimony shows DeYoung cannot respond appropriately to supervision

even in a solitary job, and that he is markedly limited in activities of daily living in that he has poor personal hygiene.

The ALJ must account for lay witness testimony and provide germane reasons for rejecting it. See Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). However, the ALJ is not required to discuss non-probative evidence. See Vincent ex. rel. Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

Here, the ALJ rejected Joanna Percilick's testimony because her credibility was undermined by that fact that she illegally supplies DeYoung with marijuana. Tr. 20. The ALJ also noted that her testimony was inconsistent with objective findings of record and with the treatment record. Tr. 20. I find these to be germane reasons.

The ALJ also found that Abigail DeYoung's testimony was not entitled to much weight because she had infrequent contact with her father, and because she endorsed limitations beyond his assessed residual functional capacity. Tr. 20. I find these reasons to be germane.

## IV. **The ALJ properly determined that DeYoung's impairments did not meet a Listed Impairment.**

DeYoung folds an assertion of error at step two of the sequential analysis into other arguments in his brief. He contends the ALJ erred at step two by failing to find that DeYoung's impairments meet or equal an impairment that the Social Security Administration has determined is dispositive of disability.[1] Specifically, DeYoung alleges that he meets Listings 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders), and/or 12.08 (Personality Disorders), based on Dr.

---

[1] The assessment of whether a claimant's impairments meet or equal a Listing is performed at step three of the sequential evaluation, not step two, as DeYoung states.

Trueblood's diagnosis of major depression or dysthymia, social phobia, anxiety disorder, and personality disorder. Tr. 127, 242.

The ALJ agreed with DeYoung that Dr. Trueblood's findings would establish that DeYoung's condition "was severe enough to meet a mental listing under Appendix 1, Subpart P, Regulations No. 4," were they credible. Tr. 18. However, as discussed above, the ALJ properly discredited Dr. Trueblood's assessment. Therefore, the ALJ did not err at step three of the sequential evaluation.

## V.     The ALJ's step five determination was supported by substantial evidence.

In step five, the Commissioner must show that the claimant can do other work which exists in the national economy. Andrews, 53 F3d at 1043. The Commissioner can satisfy this burden by eliciting the testimony of a vocational expert (VE) with a hypothetical question that sets forth all the limitations of the claimant. Id. The assumptions in the hypothetical question must be supported by substantial evidence. Id.

DeYoung contends the ALJ's hypothetical question to the VE was incomplete because it omitted a limitation from overhead reaching, as well as limitation from exposure to fumes, odors, dust, gases and poor ventilation, which agency doctors imposed. Tr. 202-03. Further, DeYoung contends he is limited by a pulmonary condition, but he does not specify how, nor did any doctor endorse work-related limitations resulting from DeYoung's pulmonary condition.

The ALJ considered all the evidence and posed his vocational hypothetical question based on the limitations supported by the record as a whole. Because the ALJ did not find support in the record for the above limitations asserted by DeYoung, it was not error for him to exclude them from his hypothetical question. See Osenbrock v. Apfel, 240 F.3d 1157, 1163-65 (9th Cir. 2001) (ALJ

is free to accept or reject restrictions that are not supported by substantial evidence). Accordingly,

I find the ALJ's hypothetical question was sufficient.

## **RECOMMENDATION**

Based on the foregoing, the Commissioner's decision should be AFFIRMED, and this case

should be DISMISSED.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit*

*Court of Appeals.* **Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate**

**Procedure, should not be filed until entry of the district court's judgment or appealable order.**

*The parties shall have ten days from the date of service of a copy of this recommendation within*

*which to file specific written objections with the court. Thereafter, the parties have ten days*

*within which to file a response to the objections.* **Failure to timely file objections to any factual**

**determinations of the Magistrate Judge will be considered a waiver of a party's right to de**

**novo consideration of the factual issues and will constitute a waiver of a party's right to**

**appellate review of the findings of fact in an order or judgment entered pursuant to the**

**Magistrate Judge's recommendation.**

DATED this __6___ day of May, 2005.


_____/s/_____
_____John P. Cooney
                                        United States Magistrate Judge